UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SMITH ROCKE LTD.,<br><br>                    Plaintiff,<br><br>          v.<br><br>REPÚBLICA BOLIVARIANA DE VENEZUELA, SUPERINTENDENCIA DE LAS INSTITUCIONES DEL SECTOR BANCARIO f/k/a/ SUPERINTENDENCIA DE BANCO Y OTRAS INSTITUCIONES FINANCIERAS, FONDO DE PROTECCION SOCIAL DE LOS DEPÓSITOS BANCARIS, f/k/a/ FONDO DE GARANTIA DE DEPÓSITOS Y PROTECCIÓN BANCARIA, RAFAEL JOSÉ MORENO FRANCO, RASA MARIA JIMENEZ URRITIA, and JUNTA ADMINISTRADORA DE CREDICAN, C.A.<br><br>                    Defendants. | Civil Action No. 12-cv-07316 (LGS) |

## DECLARATION OF JESÚS ESCUDERO

I, Jesús Escudero, being of legal age and pursuant to 28 U.S.C. § 1746, based on my own personal knowledge, hereby declare as follows:

1.   I am a Venezuelan citizen, resident in Venezuela and a principal of the Caracas-based law firm, Torres Plaz & Araujo, where I have worked since 1996.  I am also a professor in the Faculty of Juridical and Political Sciences at the Universidad Central de Venezuela and Universidad Monteavila.  I am an attorney in good standing, admitted to practice before the Supreme Court of Venezuela and have been licensed to practice law in Venezuela since 1996.

2.  I am a *magna cum laude* graduate of the Universidad Central de Venezuela, where I specialized in procedural law. Over the course of my career, I have represented a wide range of clients including international corporations, investors, and other private parties in matters related to public and private law, such as international business transactions, private international law, international civil procedure, project financing, regulatory law, litigation, and arbitration. I have served as a special appellate judge in civil, commercial, and labor law cases. I have also been appointed and served as trustee in bankruptcy proceedings and have acquired substantial experience and expertise in banking law.

3.  In my capacity as an attorney experienced in litigation in Venezuela, I have been asked by Chadbourne & Parke LLP to prepare a declaration on certain matters of Venezuelan law in *Smith Rocke Ltd. vs. República Bolivariana de Venezuela,* et al., Civil Action No. 12-cv-07316-LGS. To prepare this declaration, Chadbourne & Parke, LLP provided me with copies of the pleadings in this matter as well as the Banco Canarias-Banco Provivienda transaction documents. I have considered these documents and their appended exhibits without undertaking an independent review of the facts.

4.  The declaration issued below is based on my knowledge of Venezuelan law, and experience with the practice of Venezuelan law in light of legislation, commentaries, and case law that I consider relevant and applicable to the analysis of the following: (a) an overview of the Venezuelan banking sector regulatory framework and (b) the legal status of Banco Canarias and Credican and particular transactions carried out by these entities.

**Overview of the Venezuelan Banking Sector Regulatory Framework**

5.  The banking sector is governed by the General Law of Banks and other Financial Institutions published in Official Gazette No. 5.892 of July 31, 2008 (the "2008

Law"), which has since been revised several times, including on December 23, 2009 (Official Gazette No. 5.947), August 19, 2010 (with no major changes) and December 28, 2010, when the Venezuelan Congress issued the Law of Institutions of the Banking Sector (published in the Official Gazette Nº 6.015) (the "2010 Law"), which has since been reformed on March 2, 2011 (Official Gazette No. 39.627) (the "2011 Law").

6. The 2008 Law established that the Venezuelan government's principal regulatory agencies tasked with oversight of the financial sector are the Superintendence of Banks and Other Financial Institutions ("SUDEBAN") and Deposits Guarantee and Bank Protection Fund ("FOGADE"). These agencies are responsible for regulating and "intervening" (i.e., seizing) financial institutions and other related entities in Venezuela. Both entities are established within the Ministry of Finance, which, pursuant to Article 111 of the Organic Law of Public Administration, means that the Ministry controls how they discharge their legal functions.

7. There is no legal provision that in any way removes or insulates either entity from the direct control of the government's executive branch chain of command. SUDEBAN's highest officer, its Superintendent, is appointed by the President of Venezuela and may be removed by him at will, and SUDEBAN carries out its regulatory function under the close supervision of other Venezuelan governmental bodies, including the Supreme Governing Body of the National Financial System ("OSFIN"), the Ministry of Finance and the Central Bank of Venezuela. Like all governmental bodies, it is subject to audits by the Comptroller General of the Republic.

8. FOGADE is governed by a President, who is appointed and removed at will by the President of Venezuela. FOGADE is also subject to the inspection, supervision,

3

examination, oversight, regulation and control of SUDEBAN and, like SUDEBAN, its employees are also considered public officials.

9. To intervene and administer a particular financial entity, SUDEBAN appoints Juntas Interventoras (now known as Juntas Administradoras)[1] (hereinafter, "Juntas") (article 392). SUDEBAN establishes in prudential regulations the duties and limits of their activities. Juntas are equally part of the Venezuelan government as they are appointed and replaced by and serve at the will of SUDEBAN. Juntas are thus also part of a chain of command that leads directly to the President of Venezuela. In this case, for example, SUDEBAN initially appointed members of a Junta for Credican and later replaced them at will by decree for no stated reason.

10. No provision of the Venezuela banking regulatory framework provides that Juntas serve as fiduciaries to the shareholders of intervened entities, or that they must be exclusively loyal to creditors as a receiver might be at common law. Rather, they are organs of the Venezuelan government and are controlled by it.

11. While Article 392 of the 2008 Law states that Junta members shall not be vested with the status of public officials, this provision was later removed and does not appear in the 2011 Law. Moreover, due to the powers vested in them, Junta members are subject to certain statutes and controls that regulate the activities of public officials, such as article 3 of the Law Against Corruption (Published Official Gazette Nº 5.637 of April 7th, 2003) and Articles 9 and 78 of the Organic Law of the General Comptroller of the Republic and the National System of Fiscal Control (Published Official Gazette Nº 37.347 of

---

[1] Juntas were called Junta Interventora in the 2008—2010 versions of the law, but this was changed to Junta Administradora in the 2011 version. *See* Declaration of Edgar Hernández Behrens, p. 4 n 1 (noting that the terms are "often used interchangeably.").

December 17, 2001, revised of 2010), which requires the Junta members, like other public officials, to submit sworn statements of their assets.

12. It is important to mention that, even though the Junta are granted broad powers of corporate administration and are empowered to recommend the rehabilitation or liquidation of intervened entities, a Junta's most important decision is in fact taken by SUDEBAN, namely, whether to rehabilitate or liquidate an intervened bank. The Junta present to SUDEBAN, FOGADE and to the Venezuelan Central Bank ("BCV") any reports required for the control of its actions, including a report to the SUDEBAN in which they must inform it of the situation of the intervened bank and whether liquidation is advisable. As with most of its essential functions (see 2011 Law, Article 172), SUDEBAN must first obtain a binding opinion from the OSFIN before ordering a Junta to proceed with the liquidation or rehabilitation of an intervened bank.

13. If SUDEBAN orders liquidation, FOGADE carries it out under SUDEBAN's direction. It is necessary to note a significant distinction between the disposition of an entity's assets under bankruptcy procedure (Article 914 of the Commercial Code) and under the intervention and liquidation procedures (e.g. Articles 397 of the 2008 Law). The principal difference is that in the bankruptcy procedure, the liquidator ("*Sindico de la Quiebra*") sells the assets, pays the debts and the remaining assets are distributed among the shareholders, and all of these activities are performed under the supervision of the Commercial Matters Courts, and the creditors. By contrast, in the case of liquidation by FOGADE in accordance with the 2008 Law, FOGADE pays the debts and keeps the assets. In light of this, it cannot be said to be a fiduciary of the intervened entities' shareholders in any respect.

14. FOGADE has never, to my knowledge, compensated any shareholders for the value of their shares in a liquidated financial institution, despite the ostensible provisions for the payment of shareholder assets following intervention (Article 258) and liquidation (Article 265(7), which applies to interventions from March 2, 2011 forward) introduced in the 2011 reform law. In addition, other than an administrative challenge or judicial appeal of SUDEBAN or FOGADE's decrees, there is no provision under Venezuelan law offering a remedy by which shareholders of intervened or liquidated entities can recover the value of their shares in an intervened or liquidated entity.

**Legal Status of Banco Canarias and Credican and Related Transactions**

15. *Sale of Banco Canarias Shares to Banco Provivienda ("BanPro"):* Pursuant to Article 21 of the General Banking Law (2008), which was in force at the time, purchases of bank shares made through the stock exchange did not require SUDEBAN's prior authorization;[2] rather, SUDEBAN only needed to receive notice of such transactions within five (5) days of their registration in the shareholders' registry.

16. Under article 103 of the Capital Market Law of 1998 (which remained in force until August 17, 2010), the certification of a transaction issued by the Stock Exchange was considered proof of a purchase sufficient to satisfy the notice requirement under article 21 of the General Banking Law (2008), even though the general rule under article 296 of the Commercial Code is that the proof of ownership of shares is found in a company's shareholders registry.

17. Pursuant to Article 1.161 of the Venezuelan Civil Code and Article 8 of the Venezuelan Commercial Code, property rights are duly transmitted by the seller to the

---

[2] The exemption for stock transactions from SUDEBAN's prior approval was removed by the December 23, 2009 revision of the Law (Official Gazette No. 5.947).

purchaser once they declare their intention to execute the sale. Accordingly, absent a timely objection from SUDEBAN, which pursuant to Article 19 needs to be made within 45 days of its notification of a transaction, the sale of Banco Canarias to BanPro was valid as of July 2, 2009, the date, according to the transaction documents, when the parties first declared their intent to execute the sale. None of the resolutions later issued by SUDEBAN which mention the transaction state that SUDEBAN did not receive notice in a timely fashion.

18. Accordingly, once the time for SUDEBAN's objection passed, in accordance with the principle of legitimate expectations,[3] which guarantees the rights of all people from the activities and powers of public administration, the parties related to the purchase of Banco Canarias could rely on the fact that the transfer was valid as it was not objected to by SUDEBAN. In this regard it should be noted that the intervention decree of BanPro issued several months later indicates that at that time (November 19, 2009), the assets had yet to be divested from BanPro.

19. Assuming SUDEBAN was notified of the purchase within the five days following the transaction but failed to object to the transaction within a period of 45 consecutive days after the notice, the objection by SUDEBAN and order to reverse the transaction on September 29, 2009 (Beherens Decl., Ex. 3) was untimely.

20. *Intervention of Credican:* As it appears SUDEBAN did not object in time to the stock sale of Banco Canarias to BanPro and that the sale was therefore valid, the basis for the intervention of Credican on August 27, 2010, namely, that it was deemed to be a related company to Banco Canarias with overlapping ownership, was based on outdated

---

[3] *See* Decision of the Political and Administrative Chamber of the Supreme Court of Justice No. 613 (May 15, 2012); Constitution Chamber, Decision No. 3180 (December 15, 2004).

information from a Shareholders Resolution from September 2009 which did not reflect the valid transfer of Banco Canarias shares to BanPro.

21. On December 2, 2010, Credican filed before the Contentious Administrative Courts an appeal for nullity against SUDEBAN's Resolution Nº 503-10 in which the administrative appeal against Resolution Nº 486.10 was overruled. However, the appeal for nullity was declared inadmissible without pronunciation of its merits, due to the fact that it was presented by an attorney appointed after the intervention order by the legal representatives of Credican.

22. ***Transfer of Credican Shares to Smith Rocke, Ltd.:*** I have read where Defendants Junta Administradora and Venezuela argue that Smith Rocke has not completed the necessary formalities of Venezuelan corporate law to establish its ownership of Credican shares. As noted (see ¶ 18), property rights are duly transmitted by the seller to the purchaser once they declare their intention to execute the sale. Accordingly, the sale of the Credican shares to Smith Rocke Ltd. could be valid and legal under Venezuelan law, even if it has not been registered in the Shareholder Registry. In fact, it is a very common practice in Venezuela for share sales to occur during shareholders' meetings. The registry process is a requirement for the company officials to comply with, so after the meeting, the purchase is registered in the Shareholder's Registry (*Libro de Accionistas*) and the sale is dated once the seller and purchaser reach an agreement for the price and quantity of the shares.

23. The reason it may not have been registered most likely is due to the fact that the Junta Administradora controls access to the Shareholders' Registry, and accordingly, the transaction could only be registered with the Junta's agreement and assistance.

8

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 13, 2013

In Caracas, Venezuela

JESÚS ESCUDERO